# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

DIANA WOOD,

                **Plaintiff,**

-vs-                                         **Case No.  6:05-cv-1648-Orl-JGG**

COMMISSIONER OF SOCIAL
SECURITY,

                **Defendant.**

_____

## MEMORANDUM OF DECISION

       Plaintiff Diana S. Wood ["Wood"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying Wood's application for Supplemental Security Income.  *See* Docket No. 17 at 1 (Plaintiff's brief).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

       On November 5, 2002, Wood filed a claim for supplemental security income benefits, claiming disability as of March 1, 1985.  R. 45.  On December 15, 2004, the Honorable Charles Romo, Administrative Law Judge ["ALJ"], held a hearing on Wood's claim in Daytona Beach, Florida.  R. 255 - 89.  Attorney Richard Schwartz represented Wood at the hearing.  R. 255.  The ALJ heard testimony from Wood only.

       On June 11, 2005, the ALJ issued a decision that Wood was not disabled and not entitled to benefits.  R. 11-22.  Following a review of the medical and other record evidence, the ALJ found that Wood had no past relevant work.  R. 21, Finding 6.  The ALJ found that Wood nevertheless retained

the residual functional capacity ["RFC"] to "perform substantially all of the full range of light work." R. 21, Finding 9.  Applying the Medical-Vocational Guidelines, the ALJ concluded that Wood was not disabled.  R. 21, Finding 10.

The Appeals Council denied review on August 30, 2005.  R. 5-7.  On November 3, 2005, Wood appealed the Appeals Council's decision to the United States District Court.  Docket No. 1. On April 24, 2006, Wood filed in this Court a memorandum of law in support of her appeal.  Docket No. 17.  On Jul y7, 2006, the Commissioner filed a memorandum in support of her decision that Wood was not disabled.  Docket No. 20.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Wood assigns three errors to the Commissioner.  First, Wood claims that the Commissioner erred in failing to obtain testimony from a vocational expert ("VE") as Wood is unable to perform a full range of employment at the appropriate level of exertion and application of the Medical Vocational Guidelines ("the grids") was improper.  Docket 17 at 5.   Second, Wood claims that the ALJ erred by finding her testimony regarding her subjective complaints as not credible.  Docket 17 at 7.  Third, Wood claims that the Commissioner failed to properly consider her obesity in determining her residual functional capacity.  Docket 17 at 8.

The Commissioner argues that substantial evidence supports her decision to deny disability. First, the Commissioner argues that Wood's pain complaints were unsupported by documented objective evidence substantiating the degree of pain and symptoms alleged.  Docket No. 20 at 5. Second, the Commissioner argues that the ALJ appropriately considered Wood's obesity and incorporated it into the RFC determination.  Docket No. 20 at 6-8.  Third, the Commissioner argues

that, because substantial evidence supported the ALJ's determination that Wood could perform "substantially all of the full range of light work," reliance on the grids was permissible and the ALJ was not required to obtain evidence from a VE.  Docket No. 20 at 10.

## III.   THE STANDARD OF REVIEW

### A.   AFFIRMANCE

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.    REVERSAL

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.   42 U.S.C. § 405(g)(Sentence Four).   The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.   *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).   This Court may reverse the decision of the Commissioner and order an award of disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt.   *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).   A claimant may be entitled to an immediate award of benefits where the claimant has suffered an injustice, *Walden v. Schweiker*, 672 F.2d 835, 840 (11th Cir. 1982), or where the ALJ has erred and the record lacks substantial evidence supporting the conclusion of no disability, *Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985).

### C.    REMAND

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).   To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.

*Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord, Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g).  To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is

a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also*, *Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[1] *Id.*

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six. *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text. In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction. *Id.* In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court. *Id.* Any Plaintiff intending to seek attorney's fees for past-due benefits under 42 U.S.C. § 406 (b)(1)(A) shall move the Court to include in any remand order an extension of the 14-day period described in Fed. R. Civ. P. 54 (d)(2)(B) so as to specify an extended deadline that follows the Commissioner's determination of Plaintiff's past-due benefits. *Bergen v. Comm'r of Soc. Sec.*, 454 F. 3d 1273, 1278 n.2 (11th Cir. 2006).

### A.    DEVELOPING THE RECORD

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C. § 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.

Where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Cowart*, 662 F.2d at 735 (citations omitted).

### B.    THE FIVE STEP EVALUATION

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she

is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520(f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make it clear to the reviewing court that the ALJ has considered all alleged impairments, both individually and in combination, and must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See Jamison v. Bowen*, 814 F.2d 585, 588 - 89 (11th Cir. 1987); *Davis*, 985 F.2d at 534.  A remand is required where the record contains a diagnosis of a severe condition that the ALJ failed to consider properly.  *Vega v. Commissioner*, 265 F.2d 1214, 1219 (11th Cir. 2001).

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  If the claimant is unable to establish an impairment that meets the Listings, the claimant must prove an inability to perform the claimant's past relevant work.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).  In this step, the ALJ assesses the claimant's residual functional capacity ["RFC"].  This assessment measures whether

a claimant can perform past relevant work despite his or her impairment.  20 C.F.C. § 404.1520 (f); *see also, Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).   The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, and pull.  *See* 20 C.F.C. § 404.1545(b).

The ALJ first considers whether the claimant has the RFC to perform the functional demands and duties of a past job as actually performed by the claimant.  *See* SSR 82-61.  If so, the claimant is not disabled.  If not, the ALJ then considers whether the claimant can perform the functional demands of the job as it is generally performed in the national economy.  SSR  82-61.  In determining the physical exertional requirements of work available in the national economy, jobs are classified as sedentary, light, medium, heavy, and very heavy.  20 C.F.C. § 404.1567.

The claimant must prove disability on or before the last day of his or  her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416(i)(3); 423(a), (c).  If a claimant becomes disabled after losing insured status, the claim for disability benefits must be denied despite the claimant's disability.  *See, e.g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### C.     OTHER WORK

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational

opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also, MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).

It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are severe enough to preclude a

wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

### D.   TREATING PHYSICIANS

Absent the existence of "good cause" to the contrary, the ALJ must give substantial weight to the opinion, diagnosis and medical evidence of a treating physician. *See MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Lewis v. Callahan*, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Similarly, the ALJ may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1986). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also, Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also,* 20 C.F.R. § 404.1527(d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because those ultimate determinations are for the Commissioner. 20 C.F.R. § 404.1527(e).

The ALJ must, however, state with particularity the weight given different medical opinions and the reasons therefore, and the failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Without the ALJ making the necessary findings, it is impossible for a reviewing court to determine whether the ultimate decision is supported by substantial evidence. *Hudson v. Heckler*, 755 F.2d 781, 786 (11th Cir. 1985).

### E.   PAIN

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.   42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1529.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423(d)(5)(A).

### F.   CREDIBILITY

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not

disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

### G.    MEDICAL TESTS AND EXAMINATIONS

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also, Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may

-14-

be reversible error).   Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.   20 C.F.R. § 416.917 (1998).

### H.   THE EVALUATION OF MENTAL DISORDERS

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such impairment may impose on the individual's ability to work.   The listings for mental disorders are arranged in nine diagnostic categories.   20 C.F.R. Pt. 404, Subpt. P, App. 1.    The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.   A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526.   An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.   20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.   The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.   20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.   Functional limitations are assessed using the criteria in paragraph B of the listings for

-15-

mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living;  social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long period prior to the date of adjudication in order to establish the individual's impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked during the period of time pertinent to the determination of disability.  Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms.  Such individuals may be much more impaired for work than their signs and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single examination may not adequately describe these individuals' sustained ability to function.  It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress.  20

C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist.  These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

V.      **APPLICATION AND ANALYSIS**

A.      **THE FACTS**

Wood was born on November 6, 1962, and was 42 years old at the time of the administrative hearing.  R. 20, 257.  At the hearing before the ALJ on her claim for Supplemental Security Income benefits, Wood testified that she continued school until approximately seventh grade.  R. 261-62.

Wood has not performed any work during the past 15 years.  R. 56, 262.  Wood claims that she became unable to work on March 1, 1985, due to partial paralysis of the right leg below the knee, a head injury that impairs her ability to read, arthritis, black out spells and memory lapses.  R. 45, 49, 55.  At the hearing, Wood amended her alleged onset date to November 5, 2002.  R. 14, 49.

On August 26, 1999, Wood saw Marianne Jacobs, D.O., for right foot pain that Wood attributes to a bicycle accident on July 18, 1998.  R. 112.  Although Wood was examined at the time of the accident and was treated with a walk-in boot, she did not return for further treatment.  *Id*.  Wood complained of pain and swelling when standing up too long or walking too long, and that her foot sometimes turns black when it is wet.  R. 113.  A review of her psychiatric system revealed no unusual crying spells, thoughts of suicide, hallucinations, anxiety, depression or improbable beliefs.  *Id*.  Examination revealed a slightly antalgic gait with pain when putting pressure on the right foot.  *Id*.

There was some decreased range of motion of the foot and pain with movement on dorsi flexion, plantar flexion, eversion and inversion.  R. 114.  Power testing was 5/5 in all major muscle groups.  *Id*.  The remainder of the motor exam was normal.  *Id*.  Deep tendon reflexes revealed hypo-reflexivity throughout the right foot.  *Id*.  Dr. Jacobs stated that Wood "does not have a lot of pain," and that the possible diagnosis was a mild case of reflex sympathetic dystrophy ("RSD").  *Id*.  Dr. Jacobs proposed referring Wood to Dr. Hatch to diagnose any underlying orthopedic injury, to conduct a triple phase bone scan, to conduct electrodiagnostics on the right foot, and to start physical therapy.  *Id*.

Nerve conduction studies dated October 14, 1999, revealed very mild or slight delay in the right peroneal F-wave.  R. 109 - 11.  Dr. Jacobs concluded there was no evidence for neuropathy on the basis of this exam.  R. 111.

Wood followed up with Dr. Jacobs on October 25, 1999.  R. 108.  Wood was undergoing therapy and was doing better.  *Id*.  Although Wood complained of pain in the right foot at times with tingling in the 5th right small toe, she was experiencing no pain at the time of her appointment.  *Id*.  Objective examination of her foot revealed no allodynia, no discoloration, no swelling and normal reflexes.  *Id*.  There was no evidence of RSD during the examination.  *Id.*  A bone scan was again recommended.  *Id.*

A 3 phase bone scan of the feet dated November 5, 1999, was negative for RSD.  R. 231.  The radiologist, however, noted persistently increased activity at the site of fracture on the delayed images that raised suspicion for nonunion.  *Id*.  He suggested correlation with plain radiographs.  *Id*.

On January 28, 2002, Wood was seen by a licensed mental health counselor (LMHC) at "Our" Children First for an bio-psychosocial evaluation.  R. 137-40.  Wood complained of financial and family stressors related to the separation from her husband, and his abusive treatment of her and her daughters.  R. 137.  The onset was within the past year.  R. 137.  The LMHC diagnosed Wood with a Dysthymic Disorder (300.4), rule out Borderline Disorder.[2]  Wood's Global Assessment of

---

[2] Dysthymic disorder (or dysthymia) is a depressive mood disorder.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (American Psychiatric Association 4th Ed. 1994) [hereinafter "DSM-IV"]. The diagnostic criteria for dysthymic disorder is a depressed mood for most of the day (for more days than not) for at least two years, with the presence of two or more of the following: poor appetite or overeating; insomnia or hypersomnia; low energy or fatigue; low self-esteem; poor concentration or difficulty making decisions; feelings of hopelessness. DSM-IV at 349.  The DSM-IV diagnosis code provides no severity specifier for dysthymic disorder.

Functioning ("GAF") score was 48.[3]  R. 139.  The LMHC recommended individual counseling 1-2 times per week for at least 12 weeks, and a psychiatric evaluation referral.  R. 140.

Records from "Our" Children First reflect that as of May 6, 2002, Wood had been seen for nine individual counseling sessions over a three month period.  R. 133.  As evidence of Wood's desire to resolve her feelings of depression, the counselor noted that Wood walked to the library where her sessions were held.  *Id.*  Wood's counselor recommended an additional 8-12 individual counseling sessions.  *Id.*

On September 12, 2002, Elek J. Ludvigh, Ph.D. conducted a psychological evaluation of Wood.  R. 124-30.  Dr. Ludvigh administered five tests:  the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III"); the Kaufman Test of Educational Achievement (K-TEA); the Bender Visual-Motor Gestalt Test; the Temperament Type Research Instrument; and the Incomplete Sentences Form. R. 124.  Based on the WAIS-III, Wood's Verbal IQ score was 75, which placed her within the Borderline Mentally Retarded range at approximately the fifth percentile.  R. 126-27.  Wood's Performance IQ score was 86, which placed her within the Low Average range at approximately the 18th percentile.  *Id.*  Wood's Full Scale IQ was 78, which Dr. Ludvigh determined was uninformative as there was a substantial discrepancy between Wood's Verbal IQ and Performance IQ scores.  *Id.*

Based on the K-TEA test, Dr. Luvigh concluded that Wood's score was equivalent to a first grade in reading, a third grade in spelling, and an eighth grade in arithmetic.  R. 128.  Dr. Luvigh

---

[3]  The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or u nable to care for himself).  DSM-IV at 32.  A GAF score of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job).  *Id.*

found Wood's reading score to be "startlingly low, particularly for an individual who has been involved in Adult Basic Education classes." R. 127.

Dr. Luvigh opined that Wood has Post Traumatic Stress Disorder ("PTSD") (309.81), which is primarily reflected through her weekly nightmares, a heightened level of anxiety, exaggerated startle response, frequent emotional and physiological over-arousal, and increased feelings of depression. R. 128. Dr. Luvigh's other diagnoses were Dysthymia, Primary Type, Early Onset (300.40) and reading disability (315.00). R. 129. Dr. Luvigh concluded that because of Wood's "chronic depression," she will have "difficulty in effectively focusing upon work activities and her mind will tend to wander to critical, suspicious, anxious, resentful or other depressive thoughts. This will cause her to appear distracted, temperamental, moody and seemingly unconcerned with many basic life and vocational activities." R. 129. In addition, due to her limited reading ability, Dr. Ludvigh opined that Wood needed to work in a setting where communication was primarily verbal and where she would not be unduly limited by her poor academic skills. *Id*. Dr. Ludvigh recommended that Wood undergo psychotherapy to deal with her depression and PTSD, and that therapy probably would be "relatively prolonged." R. 130.

Wood claims an onset date of November 5, 2002. R. 14, 49. On November 30, 2002, Wood was discharged from treatment at "Our" Children First, having met her treatment goals to her satisfaction, including a decrease in feelings of depression. R. 131. Wood was referred for group therapy through a mental health association in Daytona Beach for continued support. *Id*.

On December 17, 2002, Michael Zelenka, Ph.D. (Clinical Psychology, University of Florida) completed a Mental Residual Functional Capacity Assessment. R. 141-58. Dr. Zelenka determined

-22-

that Wood was "moderately limited" in the following areas: ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to set realistic goals or make plans independently of others. R. 141 - 42. She had moderate degree of limitations in maintaining concentration, persistence or pace. R. 156. Dr. Zelenka noted that Wood may be mildly depressed, but does not have any symptoms suggestive of PTSD. R. 143. Although Wood appears to have a Personality Disorder NOS, she retains an adequate mental ability to carry out simple instructions and relate appropriately to others in a routine work setting. *Id*.

State medical examiner, T. Thiruchelvam, M.D., conducted an evaluation on January 7, 2003. R. 161-63. Wood related her medical history and complained of numbness and occasional pain in her right leg below the knee. Wood said she had generalized arthritis pain in her joints, but was not specific as to a particular area. She stated that she had incurred a head injury in third grade and has had a memory problem since then. Wood said she was not taking any medication. Dr. Thiruchelvam noted that Wood was alert, oriented and knew exactly when the head injury occurred that caused her memory problems.

Wood was five feet seven inches tall, and weighed 212 pounds. On examination, she was able to fully expand her chest, with good air entry bilaterally with no added sounds or wheezing. There was a good range of motion and strength in all extremities, with exception for pain in the lower right extremity. There was no muscle wasting as confirmed by measurements of both lower extremities.

Deep tendon reflexes were symmetrical bilaterally.  Her gait was normal without assistive device and she walked on her toes and heels without difficulty.  She was able to squat, but needed the assistance of the table to raise herself.  Dr. Thiruchelvam stated, "'40 year old with history as above for her disability exam.  Examination of the lower extremities reveals good peripheral pulses.  No peripheral edema present.  Examination of the major joints and hands does not reveal any evidence of any inflammation, swelling or effusion at this time.  No obvious local tenderness reported over the right knee.  Patient has no clinical sighs of CHF.  Patient has no clinical signs of significant respiratory impairment. No follow up, no medications, no advice given. . . ."  R. 163.

On May 6, 2003, an LMHC with the Act Corporation conducted a mental status examination of Wood.  R. 202-03.  Wood was oriented to time, place, person and situation.  R. 202.  Her memory was good, her speech appropriate, and her thought content was logical and coherent.  *Id*.  Her affect was normal, she was cooperative, appeared appropriately and had appropriate motor behavior.  R. 203.  Wood reported sometimes that she was unable to sleep at night and that she was unable to eat.  *Id*.  Wood sought treatment for stress due to removal of daughters from her home and divorce due to her husband's molestation of their daughters.  R. 200.   The LMHC diagnosed Wood as having an Adjustment Disorder with Depressed Mood (309.00).  R. 199.  Her treatment plan was to receive individual counseling one to two times per month.  R. 200.

Wood was seen at emergency room of the Bert Fish Medical Center on September 2, 2003.  R. 205-08.  Wood complained of mild to moderate constant pain in both legs that started two to three weeks ago.  R. 207.   Wood was discharged to go home in stable condition with directions to follow up.  R. 206.

-24-

On March 23, 2005, state consultative psychological examiner J. Jeff Oatley, Ph.D., conducted an examination of Wood. R. 234-39. Wood reported that she suffered from shortness of breath, diabetes, fibromyalgia, chronic leg pain and headaches. R. 234. Dr. Oatley administered the Wechsler Memory Scale Form, III and the Minnesota Multiphasic Personality Inventory ("MMPI") II. Dr. Oatley noted Wood's prior treatment with ACT, and noted no inpatient counseling or pharmacological treatment. R. 234. Wood's attention span and activity level were appropriate, she was cooperative with the examination, she was able to sign her name in cursive, and she was able to complete over three hours of testing without taking any breaks. R. 235. Dr. Oatley determined that the MMPI II test scores were invalid and that Wood gave answers usually associated with a "fake bad" presentation. R. 236. Her Wechsler scales were consistent with Borderline Intellectual Functioning. *Id*.

Dr. Oatley diagnosed Wood with borderline intellectual functioning (V62.89), probable reading disorder, rule out diabetes and rule out fibromyalgia. *Id*. She was noted to have slight limitations in understanding and remembering detailed instructions, in carrying out detailed instructions and in the ability to make judgments on simple work related decisions. R. 238. Dr. Oatley noted that Wood understood the value of money, could correctly compute simple mental purchases, and appeared capable of managing finances. R. 236.

State medical examiner, Gerald Woodard, D.O., performed an evaluation on April 4, 2005. R. 240-44. Wood complained of numbness in her lower extremities, loss of motion in her left arm of two years duration, jerking in her arms and legs of four months duration and chest pain that occurs about once per week and lasted for about ten minutes. R. 240. On examination, the claimant

weighed 253 pounds and was obese.  R. 242.  Wood's right lateral foot was hypersensitive to touch, but otherwise the examination was normal.  R. 243.  Her gait was slow and purposeful in the office, but she moved fluidly across the parking lot, up and down the curb and in and out of her vehicle.  R. 243.  Her affect was flat with poor eye contact and histrionic complaints.  *Id.*  Dr. Woodard concluded that, although Wood claimed difficulty with all capacities, she exhibited full range of motion in all spine and extremities.  *Id.*

Dr. Woodard completed the form "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)."  R. 245-48.  Dr. Woodard opined that Wood had the residual functional capacity to occasionally lift/carry 20 pounds, frequently lift/carry 20 pounds, with limitation for "perceived right foot pain," that she could stand/walk about 6 hours in an 8-hour workday, and that her ability to lift/carry and push/pull were limited in the lower extremities due to nonunion fracture of the right 5th metatarsal.  R. 245-46.  An MRI of the Wood's brain returned negative results in April 2005.  R. 254.  A CT scan of Wood's brain in April 2005 failed to show any evidence of intracranial abnormality.  R. 253.

At the hearing, Wood's testified that she had never been tested for diabetes and that she does not know that she has diabetes.  R. 265-66.  Wood also testified that she weighed 250 pounds (R. 258); that she did not have a driver's license (R. 260); that she was not taking any medication (R. 268); that she could sit for 30 minutes, walk for 15 minutes, and lift 5 pounds (R. 269-70); that she could get along with people, but had poor concentration (R. 270); that she rated her pain on average as being an 8 on a scale of 0 to 10, with 10 being the highest (R. 270-71); that she cooked, cleaned, dusted, did laundry and went food shopping (275-77); that she walked her dogs and watched her son

-26-

on normal days (R. 279-80); that she had daily headaches lasting six hours (R. 263), double vision twice a week lasting for 30 minutes (R. 263-64), constant pain (R. 264), fibromyalgia (R. 265), urinary incontinence (R. 271), asthma (R. 282), and numbness in her hands (R. 283).

**B.    THE ANALYSIS**

**1.    Evaluation of Wood's Credibility**

The ALJ determined that Wood's allegations of her disabling condition were not credible because they were "inconsistent with medical signs, diagnostic testing and the opinions of treating and examining medical sources." R. 19.  Wood argues that the ALJ does not provide any specific reasons why her testimony was not credible.  Docket 17 at 7.

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote,* 67 F.3d at 1561-62*; Jones v. Dep't of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

The Commissioner argues that the ALJ properly articulated his reasons for discrediting Wood's testimony regarding her subjective complaints, citing generally R. 17-19.  Docket 20 at 5. The cited record details the ALJ's summary of the examinations by Drs. Oately, Woodard, Jacobs and

Ludvigh, and the weight given those reports.  When Wood's testimony is compared to the credited

medical findings, the record is obvious regarding the ALJ's determination of Wood's credibility.

### 2.      Consideration of Wood's Obesity

Wood argues the ALJ erred in failing to consider the impact of Wood's obesity on her ability

to work as required by SSR 02-01p.  Docket 17 at 8.  SSR 02-01p essentially requires the ALJ to

consider the impact of obesity at Steps 2-5 of the sequential evaluation process.  The ALJ considered

obesity at Step 3, and found Wood's obesity to be severe, but that none of her impairments, either

singly or in combination, were severe enough to meet or medically equal the impairments listed in

Appendix 1, Subpart P, Regulations No. 4.  R. 18.  As Wood has no past relevant work, her attack on

the decision is focused on Step 5 of the sequential evaluation process.

The ALJ appropriately considered Wood's obesity in determining her RFC.  As described

above, Wood's obesity was specifically diagnosed by Dr. Woodard and included in his RFC

determination.  Dr. Woodard was one of the doctors whose opinion the ALJ accorded "greater

weight."  R. 19.  None of the medical opinions provide any basis to conclude that Wood's obesity

impacts her ability to engage in substantial gainful activity.

### 3.      Reliance Upon the Grids

The ALJ determined that Wood was not disabled based on Medical-Vocational Rule 202.17.

R. 21, Finding 10.  Wood argues that she has non-exertional impairments that significantly limit her

basic work skills.  Docket 17 at 5.  Wood focuses on Dr. Luvigh's determination that, because she

needed to work in a setting where communication was primarily verbal due to her limited reading

ability and where she would not be limited because of her poor academic skills, Wood could not

perform a full range of work.  Docket 17 at 7.  The ALJ accepted Dr. Ludvigh's opinion only as to Wood's IQ and her reading ability.  R. 18.

Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements). Exclusive reliance is not appropriate, however, "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).

In determining Wood's mental RFC, the ALJ found that she had no restriction of activities in daily living, and only mild difficulties in maintaining social functioning, concentration, persistence or pace.  R. 18.  Thus, Wood does not have a mental impairment that satisfies the "C" criteria of the listings.  *Id.*  Considering both her mental and physical limitations, the ALJ determined that Wood has the RFC to "perform substantially all of the full range of light work."  R. 21, Finding 9.  These findings are supported by substantial evidence.

Dr. Ludvigh's opinions regarding Wood's limited literacy and communication skills do not support Wood's argument that testimony from a VE was required.  Medical-Vocational Rule 202.17 applies to younger persons with an RFC for light work and who have limited or less literacy skills, who are able to communicate in English, and have no work experience.  20 C.F.R. Pt. 404, Subpt. P, App. 2.  Even if Wood was completely illiterate and unable to communicate in English, the grids

would still direct a finding of not disabled.  See Medical-Vocational Rule 202.16.  The ALJ did not

err in failing to obtain testimony from a VE.

## VI.    **CONCLUSION**

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

is directed to enter a separate judgment and close the case.

**DONE AND ORDERED** this 1st day of March, 2007.


JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE


The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and to:

Mary Ann Sloan, Regional Chief Counsel
Dennis R. Williams, Deputy Regional Chief Counsel
Selisa M. Wright, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

The Honorable Charles D. Romo
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Desoto Building, #400
8880 Freedom Crossing
Jacksonville, FL 32256-1224